J. H. Walker v. Commissioner.
Walker v. Commissioner
Docket No. 112026.
United States Tax Court
1943 Tax Ct. Memo LEXIS 15; 2 T.C.M. (CCH) 1152; T.C.M. (RIA) 43524; December 27, 1943
*15 Hilary H. Osborn, Esq., 407 American Trust Bldg., Nashville, Tenn., for the petitioner. Frank M. Thompson, Jr., Esq., for the respondent. MELLOTT
Memorandum Findings of Fact and Opinion MELLOTT, Judge: The Commissioner determined deficiencies in the income tax of petitioner in the amount of $411.91 for the calendar year 1938, and $260.64 for 1939. The sole question is whether petitioner is entitled to expense deductions of $1,272.95 in 1938 and $951.01 in 1939, under the provisions of section 23 (a) of the Revenue Act of 1938 and of the Internal Revenue Code as amended by section 121 of the Revenue Act of 1942. Findings of Fact Petitioner is a resident of Monterey, Putnam County, Tennessee. He filed his income tax returns for 1938 and 1939, on the cash receipts and disbursements basis, with the collector of internal revenue for the district of Tennessee. During the taxable years petitioner was engaged in the lumber business and the hardwood flooring business, by virtue of his stock ownership in the Monterey Realty Company and the Monterey Hardwood Flooring Company. The realty company was engaged in the manufacture of hardwood lumber and the flooring company in the manufacture *16 of hardword flooring, the finished product. Petitioner owned other stock in addition to his interests in the two companies just mentioned. At the time of the hearing he owned or controlled approximately 4,000 acres of timber and coal lands. In 1921 a charter was procured for a corporation known as the Monterey Company. This corporation was authorized to acquire timber and coal lands, to engage in the timber and coal business, and to lease, sell, or otherwise utilize such lands as should be to the best advantage of the company. Its authorized capital stock was $10,000 divided into shares of $100 each. By amendment in 1923 its authorized capital stock was increased to $20,000. The corporation never engaged to any considerable extent in the business authorized by its charter, its principal activity being to receive the $20,000 for its capital stock with which it built a dam. Its members, numbering about 75 or 80, most of whom resided within a radius of approximately 100 miles from the lake created by the dam, used it for fishing and the surrounding lands for hunting and recreation purposes. In order to have the privileges of the lake it was necessary to have two shares of stock, and *17 petitioner purchased two shares in 1922. He enjoyed the boating and fishing privileges of the lake. He was not an officer of the company. On November 4, 1937, petitioner executed an agreement with the Monterey Company providing as follows: The terms and conditions of this lease are as follows: 1. That if the Lessee shall pay the rent as herein provided he shall peacefully and quietly have, hold and enjoy the use of the said lake and shores and all the premises within the above described boundary lines for a term of ten years from January 1st, 1938 to December 31st, 1948, both dates inclusive. 2. That the lessee shall pay to the Lessor, or its order (if the order is in writing) rent of six hundred dollars per annum payable in advance on the first day of each year beginning January 1st, 1938 and continuing each successive January first as long as this lease remains in effect. 3. That the Lessee shall have the right to raze any buildings or structures now upon said leased boundary provided he shall replace the same with another or others of equal value although not necessarily of the same kind or for the same purpose and shall have the right to erect, maintain, use and enjoy any *18 additional houses, cabins and other buildings and structures as he may see fit, and to charge and collect for his own benefit any rent or other charge for the use or enjoyment thereof by other persons, the same to be done at his own cost. 4. That the Lessee during the life of this lease shall particularly have and enjoy the exclusive swimming, boating, fishing and hunting privileges upon and within said lake and boundary lines aforesaid, which he may for his own benefit sub-lease or rent to others upon such terms and for such charges as he may desire. 5. That the Lessee during the life of this lease, in addition to the annual rent, shall pay the real estate taxes assessed against the leased property when the same shall become due, beginning with the taxes for the year 1938. 6. That the Lessor agrees at its own expense to have the boundary lines herein described resurveyed and plainly marked by blazing trees and painting the blazes, which shall be done before January 1st, 1938. 7. For the consideration stated the Lessee is also hereby granted for the full period of the life of this lease the exclusive right to purchase in fee from the Lessor the land included within the boundary *19 herein described at the price of twenty thousand dollars on terms of one-fourth cash and balance payable in three equal payments on or before one, two and three years time, the deferred payments to bear interest at the rate of six per cent per annum from date of purchase until paid; and in the event this option is exercised the Lessor agrees to make, acknowledge and deliver to the Lessee, his heirs or assigns, a good and sufficient general warranty deed for said land upon receipts of the cash payment aforesaid and notes of the Lessee for the deferred payment, which notes shall be secured by a vendor's lien retained in the deed. It is also understood and agreed that upon the exercise of this option this lease shall terminate and future obligations of the Lessee to pay any rent shall be extinguished; but he shall be liable for any unpaid rent to the date of the exercise of the option. 8. That upon the termination of this lease, in case the option to purchase shall not be exercised, all the buildings and structures of a permanent character placed upon the leased premises by the Lessee shall be treated as fixtures and shall belong to the Lessor. 9. It is understood and agreed that one *20 of the Lessee's purposes in obtaining this lease is to establish and maintain a pleasure resort upon the leased boundary; and it is agreed that should anything occur not due to the Lessee's negligence making said lake and premises unfit for such purpose, he shall in that event have the right to surrender the possession of the leased premises and cancel this lease without liability for rent for the unexpired part of its term. 10. The Lessee agrees to hold the Lessor harmless against all loss by damage for accidents occurring to persons entering upon, or property brought upon, the leased premises during the time the said premises are in his possession. 11. The obligation of the Lessee to pay rent as herein above agreed is further evidenced by his ten promissory notes payable from one to ten years successively beginning January 1, 1938. 12. The effective date of this lease is January 1st, 1938, but it is agreed that from after the date it is actually signed (stated in the caption) the Lessee shall have the right to enter and be upon the leased premises for any purpose in furtherance of the objects herein expressed. WITNESS our signatures in duplicate. After the above agreement was *21 executed petitioner from time to time purchased additional stock in the company and at the time of the hearing he owned approximately 79 of the 200 shares outstanding. this stock has been purchased as cheaply as possible and petitioner intends to continue making such purchases. The land covered by the lease has timber on it and is in the center of approximately 3,500 acres of timbered land owned by the companies in which the petitioner owns a majority interest. It comprises 230.72 acres. In arriving at the amount of the payment $600of a year, as provided in the agreement, petitioner figured that 3 percent a year on $20,000 (the option price for the purchase of the tract), was good business, money to him being worth 6 percent. In 1940 or 1941 petitioner was approached by a Dr. Boyd, who suggested the possibility of establishing a boys' camp at the lake similar to a successful girls' camp about fifteen miles away. Nothing came of this suggestion. The dam was of dirt construction. In 1938 it had been standing with nothing having been done to it for nearly twenty years. As a result it was becoming washed out. After taking over the property under the agreement, petitioner repaired *22 the dam so that it would not wash away. In order to keep the public generally from going upon the land he employed a caretaker during the summer months when the public "would be entering on the property and burning up the place." During 1938 petitioner expended in connection with the project $42.95 for attorney fees, recording fees and revenue stamps; $293.98 on labor repairing the lake dam; $4.50 for printing notices to post the lake against trespassing; $331.52 on labor to guard against trespassing and forest fires; and $600, designated "rent." During the year 1939 he expended $600 for "rent"; $11.51 for revenue stamps, registration fees and blue prints of the lake; $157 for sundry labor; and $182.50 for a caretaker to guard against trespassing and forest fires. These items, totalling $1,272.95 for 1938 and $951.01 for 1939, were claimed as deductions by petitioner. Respondent determined that they did not constitute allowable deductions. Opinion Petitioner contends that the amounts claimed and deducted by him as expenses in computing his net income for 1938 and 1939, and which were disallowed by the respondent, were ordinary and necessary expenses; that they were paid in connection *23 with the use, possession, preservation, conservation and maintenance of property held with a profit motive; and were proper deductions under the provisions of section 23 (a) of the Internal Revenue Code as amended by section 121 of the Revenue Act of 1942. [1] The amendment was made retroactive and applies to the taxable years 1938 and 1939. *24 Respondent contends that the property was not leased by petitioner for the production of income; and that, even if it be assumed that petitioner did have a profit motive and was acquiring the property with development and ultimate profit in mind, either as a separate project or in connection with his other activities in the lumber business, the expenditures in question represent capital expenditures, connected with the acquisition of the new property and protection of the old, and do not come within the ambit of subdivision (1) or (2) of the section relied upon. Subdivision (1) covers expenses paid or incurred in carrying on any trade or business, and subdivision (2) non-trade or nonbusiness expenses. The expenditures in question do not fall within the provisions of subdivision (1). Petitioner was engaged in the lumber business and they were not incurred in carrying on that business. If deductible, therefore, it must be because of subdivision (2). Under its provisions an individual may deduct ordinary and necessary expenses paid or incurred during the taxable year for the production or collection of income, or for the management, conservation, or maintenance of property held for *25 the production of income. At the hearing petitioner testified as follows: Q. Will you state to the Court in your own way just what your purpose was in obtaining a lease on this property? A. Well, I leased it with the view of promoting it and selling the land in any way I could to make a profit out of it. Q. Did you contemplate in any way effecting any sub-lease of it? A. Well, yes, I had been approached on the subject of subleasing it for a boys' camp. Q. Did you so lease it? A. No, I did not. Q. Was the leasing of property by you strictly for business purposes and uses? A. That was my idea. We went out on the lake and used it, but its lease was strictly a business venture. Q. Prior to obtaining a lease on this lake, did you have access to it for use for boating or fishing? A. Yes, sir. Q. Prior to the lease did you so use it? A. Yes, sir. Q. Aftr the lease have you used it in the same manner and to the same extent or more or less than before for this purpose? A. Not any more, but the same way. Q. I wish you would explain a little more fully to the Court by what means you expected to realize a profit in connection with this property? A. Well, there was various ways.
*26 Q. Will you explain what some of those ways were? A. There was a girls' camp about 15 miles from Monterey, and I was approached by Dr. Boyd, who is a professor and a promoter, and it was his idea that he could have a boys' camp there and a girls' camp at Mayland, and he would be able to have a lot of boys down there that probably their sisters would be at Mayland and be near each other. That is about the only proposition I had. Q. Was this proposition if accepted to bring income to you? A. If it would be as successful as the camp located at Mayland, where they had approximately 300 girls a year, at $300 apiece, why I would consider that a fair investment. * * * * *
Q. Mr. Walker, a few moments ago you mentioned Dr. Boyd. Is this Dr. Willis Baxter Boyd, of Cookville, Tennessee, to whom you referred? A. Yes, sir. Q. What business contacts have you had with him? A. In either 1940 or 1941 he approached me on the idea of developing the lake and I had been looking around for somebody that could do that kind of a job, because it was out of my business, and it was his idea that we get out this March of Progress Magazine and get the people acquainted with the lake as a forerunner *27 of doing some kind of development. Q. Did he approach you at this time, previously or afterwards, seeking a lease or the establishment of a camp at the lake? A. Dr. Boyd was looking around for something that he could get into, and he and his wife have always been around schools and handled children, and he approached me on the idea of leasing the lake or going in with him in business and developing something along the lines of the other camps over the country. Q. Did you lease the lake or permit him to operate the camp there? A. No, sir. Although the lease provided that one of the purposes of petitioner in acquiring it was to establish and maintain a pleasure resort on the property, when asked whether this was his intention he testified that he did not intend to maintain such a resort himself but would have sold it or leased it "to somebody for that kind of purpose." He also testified as follows: Q. In paragraph 4 of the lease it provides that the lessee during the life of this lease shall particularly have and enjoy the exclusive swimming, boating, fishing and hunting privileges upon and within said lake and boundary lines aforesaid, which he might for his own benefit sub-lease *28 or rent to others upon such terms and charges as he may desire? A. Yes, sir. Q. Did you do any of that? A. No, sir. Q. Why was that provision put in there? A. Well, it was not my best judgment to lease that property and permit the stockholders or anyone else to have the privileges of the use of the lake. The burden was on the petitioner to show that the expenditures in question were paid or incurred for the production or collection of income, or for the management, conservation, or maintenance of property held for the production of income. His testimony convinces us that the production or collection of income was not the purpose for which the expenditures were made, and no income was ever realized between the date of the lease in 1937 and the hearing in 1943. While some of the expenditures, such as those for the repair of the dam, for the prevention of trespassing, and for a caretaker were "for the management, conservation, or maintenance of property," they fail to meet the requirement of the statute that the property be "held for the production of income." The property held by the petitioner was a lease. His testimony indicates that he made the lease as part of a plan to purchase *29 the property at the lowest possible cost. According to petitioner money was worth six percent to him, and he decided it would be good business if he paid $600 per annum (3 percent on the stated purchase price of $20,000) and attempt to purchase the stock of the lessor corporation. Petitioner stated he bought this stock as cheap as he could and that he was about the only one to whom the stockholders could sell their stock. After the lease was executed petitioner purchased additional stock until at the time of the hearing he owned 79 of the 200 shares outstanding. When asked why he was buying the stock, petitioner testified: A. I am buying it for development. It is right in the center with a lot of timbered land of the company's in which I own the majority interest. It fits in with the other. It has got timber on it and it happens to have a lake in the center which makes it more valuable. Q. Your other holdings surround this lake property? A. Adjoins it. I have 3500 acres approximately right around it. * * * * *
Q. Did you ever intend developing it for purposes of sale? A. That is my only intention. Q. To sell it? A. Yes, sir, and sell the land. The land of the companies I *30 am associated with that own around it. A. That is your intention, to develop it for the purpose of selling it? A. Yes, sir. The evidence indicates that the expenditures were made as part of a plan to acquire the Monterey Lake property. If so they were capital expenditures and not deductible from gross income. But whether they were capital expenditures or not petitioner, in our judgment, has failed to show they were paid "for the production or collection of income, or for the management, conservation, or maintenance of property held for the production of income." We therefore decline to set aside the deficiency. Decision will be entered for the respondent. Footnotes
1. SEC. 121. NON-TRADE OR NON-BUSINESS DEDUCTIONS. (a) Deduction for Expenses. - Section 23 (a) (relating to deduction for expenses) is amended to read as follows: "(a) Expenses. - "(1) Trade or business expenses. - "(a) In General. - All the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business, * * * and rentals or other payments required to be made as a condition to the continued use or possession, for purposes of the trade or business, of property to which the taxpayer has not taken or is not taking title or in which he has no equity. * * * * *
(2) Non-trade or non-business expenses. - In the case of an individual, all the ordinary and necessary expenses paid or incurred during the taxable year for the production or collection of income, or for the management, conservation, or maintenance of property held for the production of income.↩